This is a suit for damages resulting from a collision between the automobile of the plaintiff and a truck belonging to the defendant.
The plaintiffs, Reese C. Stewart and his wife, Ethel Stewart, allege that on or about May 19, 1945 at about 11:30 P.M. plaintiff Reese C. Stewart was driving his 1936 Coupe automobile east on Highway 90 in Calcasieu Parish, Louisiana; That the plaintiff Ethel Stewart was riding in the automobile and was seated in the front seat on the right hand side, and that when at a point about 600 feet east of the place known as Vaughn's Service Station plaintiffs noticed a vehicle approaching from the east; that said approaching vehicle was on the same side of the road as the vehicle of plaintiffs'; that plaintiffs were on the south side of the highway — their right side — and that, therefore, the approaching vehicle was on its wrong side of the highway; that plaintiffs were proceeding at a moderate rate of speed, their lights burning and dimmed for the approaching vehicle, and keeping a careful lookout and *Page 31 
observing all rules of the road; that as the vehicles drew closer together, the approaching vehicle continued on its south or wrong side of the highway, and it appearing that a collision was imminent, petitioner's vehicle was turned toward the north side of the highway as this seemed to be the last clear chance to avoid a collision; that as the vehicle of petitioner was turned toward the north, the driver of the approaching vehicle also turned to the north, and petitioner then attempted to turn back to the south side of the highway but that the two vehicles were then so close together a collision could not be avoided and the two vehicles collided on the south side of said highway.
Petitioners further allege that the vehicle involved in the collision with them was a truck belonging to the Herrin Transportation Company and that the Herrin Transportation Company carried a policy of liability insurance on the truck involved in the collision with the American Fidelity and Casualty Company, Inc., and, therefore, the Herrin Transportation Company and its Insurer are made parties defendant and as a result of the collision petitioner Reese C. Stewart suffered injuries and damages which he itemized in his petition as damages totalling $7,120.00; that Mrs. Ethel Stewart suffered severe bruises, contusions and shock, every bone in her face was broken, her palate was knocked loose and all her teeth knocked out and both of her jaws dislocated; that her hearing was seriously affected and her eyesight almost completely lost, all of the above injuries resulting in great mental anguish and physical suffering; that she was further greatly damaged in that her comely was seriously and grossly impaired; that the above injuries are itemized in Article 11 of plaintiffs' petition and total $26,000.00.
The defendants filed an answer which in general denies the main allegations of plaintiffs' petition and further answers that under date of May 19th, 1945 between 11:00 and 11:15 o'clock P.M., defendant Herrin Transportation Company's driver, Ross Martin, was driving his employer's White Truck, 1941 year model with trailer attached, west upon United States Highway 90 approximately four miles west of Lake Charles, Louisiana, in a careful and prudent manner, at a reasonable and cautious rate of speed with due regard to the surrounding circumstances and traffic conditions then prevailing; that at this point defendant's driver observed a car approaching him traveling east, which was the car of plaintiffs', with bright lights shining, and that defendant's driver dimmed the lights of the said truck; that when plaintiffs' car reached a point approximately 75 feet distance from said truck that plaintiffs' car, without warning, and inexplicably cut across the highway and ran on to the north shoulder of said highway; that defendant's driver tried to stop and attempted to veer to the left in order to avert the impending collision but was unable to do so owing to the short distance between the truck and plaintiffs' car, and further owing to the fact that plaintiffs' car then cut back off of the north shoulder to its right, on to the highway again, and ran into the right side and front of defendant's truck, causing the truck and trailer to "jackknife" to the left, causing the tractor and trailer of the truck to turn over.
Defendants answer in the alternative and only in the event the Court should find the defendant's driver was guilty of negligence in the operation of the truck in any respect which contributed to the accident and collision, then defendants aver that the plaintiffs were contributorily negligent in certain acts of commission and omission, which contributory negligence defendants aver was the, or a, proximate and immediate cause of the said collision, barring any recovery by plaintiffs or either of them.
The case was duly tried and the Judge of the District Court rendered judgment, with written reasons, in favor of the plaintiff Reese C. Stewart and against the defendants, in solido, in the amount of $2,908.00 with legal interest from date of judicial demand until paid, and also rendered judgment in favor of the plaintiff Mrs. Ethel Stewart and against the defendants in the full amount and sum of $7,500.00 with legal interest from date of judicial *Page 32 
demand until paid. The defendants were condemned to pay all costs of suit.
Defendants, through their counsel, filed an application for a new trial or a re-hearing. While we do not find any ruling on this application as shown by the minutes or the record, we presume that it was overruled, for final judgment was read and signed in open court at Lake Charles, Louisiana on the 15th day of January, 1948. The defendants were granted a suspensive and devolutive appeal to this Court.
Plaintiffs Reese C. Stewart and Mrs. Ethel Stewart have answered the appeal asking that the judgment be amended so as to increase the amount awarded Mrs. Ethel Stewart from $7,500.00 to $26,000.00 and that said judgment be further amended so as to increase the aggregate amount of $2,908.00 awarded to Reese C. Stewart to the aggregate sum of $4,408.00.
The plaintiff Reese C. Stewart, his wife and small daughter were in his automobile which he was driving, proceeding east on U.S. Highway 90 at about 11:00 or 11:30 P.M. on May 19th, 1945, and Ross Martin, who was employed as a driver by the Herrin Transportation Company, defendant herein, was driving its truck west on U.S. Highway 90. Plaintiffs contend that Ross Martin was driving the defendant's truck on the south side or wrong side of the highway, and that in order to avoid if possible a collision with the defendant's truck, Reese C. Stewart pulled to the north, but that after he had pulled to the north, he contends that the driver of the defendant's truck started back to his right side or north lane of traffic, and that he attempted to get back in the south lane of the highway but was unsuccessful and the collision took place.
Ross Martin, driver of the defendant's truck, contends that he was driving west and in his own north lane of traffic on Highway 90 when he saw plaintiffs' car approaching; that he dimmed his lights and plaintiff dimmed his, but that as the plaintiffs' car got within 75 to 100 feet of his truck that plaintiffs' car suddenly swerved out of its lane of traffic to the north into his lane of traffic and even knocked up dust on the north shoulder of the highway; that he applied the brakes but released them and attempted to pull to his left into the south lane of traffic in order to avert a collision but that plaintiff, after striking the north shoulder of the highway, turned his automobile back in a southerly direction and struck his truck at the dual wheels and gas tank with such force that although the trailer stayed connected to the tractor that the dual wheels came completely out from under it.
Although the record in this case is rather voluminous, there were only three eyewitnesses who testified in the case. These were the plaintiffs, Mr. and Mrs. Reese C. Stewart, and Ross Martin, the driver of the truck involved in the accident. The Reese Stewart version of the accident is given in his testimony as follows:
"Q. Will you please state what happened about 11:30 P.M. you were traveling toward Lake Charles? A. Well, along about 11:30 P.M. while going east on U.S. Highway 90, approximately 400 feet from the place known as Vaughn's Store, and approximately 400 feet from a gulley that crosses United States Highway 90, we noticed a vehicle traveling west on the south side of U.S. 90, which was the wrong side of the highway.
"Q. The wrong side for whom? A. For the vehicle. As we drove east, it appeared that the vehicle was still bearing to the left, which was the wrong side for him to be on.
"Q. When you say to the left, do you mean to the south side of the road? A. The south side of the road, yes sir. As we drew closer together it looked as though we were going to have a head on collision. To my right, which was the south side of the highway, the shoulder is approximately nine feet and very rough; at the edge of the shoulder it is marsh, which is a jump-off."
"Q. Now, that was when the two vehicles appeared to be about a hundred feet apart? A. Yes, sir.
"Q. What did you do? A. Knowing I couldn't go to the right, I went to my left, which was the wrong side of the highway, but under the conditions of him being on my side and we drawing nearer to him *Page 33 
and with him with extra bright lights and no dimmers, I went across. As I got across, it looked as though his lights turned back to the north. Well, as his lights turned to the north it struck me that he was coming back on his side. Of course, we didn't have but a few seconds to figure. We didn't have an hour. I cut my car back to the south, which to cut back on my side of the road, and he went by me and side-swiped me in the middle of the road, at least, practically on the black line."
Mrs. Ethel Stewart's version of the accident is given in her testimony:
"Q. You are Mrs. Ethel Stewart? A. Yes, sir.
"Q. The wife of Reese C. Stewart? A. Yes, sir.
"Q. Were you with your husband about 11:30 o'clock P.M. on the night of May 19, 1945? A. Yes, sir.
"Q. What were you and your husband doing about that time? A. Driving home.
"Q. From where? A. From Sulphur.
"Q. Will you state what happened on your way home when you reached the vicinity of Vaughn's Service Station? A. Well, it was just bright lights coming ahead of us. A vehicle was on the same side with us and the lights were so bright it just seemed like the car, or whatever it was — I didn't know whether it was a truck or what. It was gaining on us and I told him to get out of the way, to do something about it. That is all I know. We hit so fast I just didn't know any more.
"Q. You couldn't tell anything about what happened after you told him to get out of the way? A. No, sir.
"Q. The collision came so fast that you don't know anything else after that? A. No, sir, I don't.
"Q. Were you knocked unconscious? A. Yes, sir, I guess I was. I don't remember anything after that.
"Q. About how long before this collision occurred did you notice this vehicle approaching you on the wrong side of the road? A. I didn't hear your question.
"Q. Is your hearing affected? A. Yes. (The reporter read the last question.) A. Well, it wasn't very long. It seemed like it all popped up all of a sudden — those bright lights.
* * * * * *
"Q. When this collision happened who else was in the car with you and your husband? A. My little girl. She was asleep on my lap.
"Q. You say the lights of this on-coming vehicle were bright? A. Bright, yes, sir. They blinded us.
"Q. Were they dimmed at any time while you were looking at them? A. I never saw them dim. They were just bright.
"Q. Were you looking at the car all the time? A. Yes, sir."
Ross Martin testified that he had been in the employ of Herrin Transportation Company between six and eight months prior to the accident of May 19th, 1945, and that he had continued to work for them until August of 1945; that on the date of the trial he was a cab driver for Lone Star Company in Kilgore, Texas; that prior to the time he was employed by the defendant company as truck driver he had been employed as a truck driver for the Missouri Pacific for about 60 days. Martin testified that on May 18th, 1945, between the hours of 7 and 10 P.M., he left Houston, Texas on his way to Leesville, Louisiana, and that he arrived there between 5:00 A.M. and 8:00 A.M. on May 19th, 1945; that when he got to Leesville with the truck, he went to the warehouse of the Herrin Transportation Company and gave the keys to a dock hand and then proceeded across the street to a tourist cabin and went to bed. He slept until around 5:00 o'clock in the afternoon of May 19th, 1945. While Martin was sleeping, the truck had been taken to Camp Polk, unloaded and re-loaded with 14,000 pounds of hand grenades, which Martin was to deliver back in Houston, Texas. Martin left Leesville with the load of hand grenades between 7:00 and 9:00 P.M.
Martin testified that he made one stop after he left Leesville, which was at the Lake Charles Station of the Herrin Transportation Company where he punched the clock at six minutes until 11:00 P.M.; that he did not tarry for any length of time at *Page 34 
the station but proceeded on his way to Houston, west on Highway 90; that he was driving around 35 miles per hour and he was sure that it could not be over that as the truck would not go over forty miles per hour unless it was in over-drive and that it had never been put in over-drive. As to the accident itself, he testified:
"Q. Please state what appeared ahead of you at the point of the accident which you said was about a mile past the chemical plant? Just from the beginning as to what you saw, and I will take you on from there. A. The traffic was thick. I was driving along. I was more or less afraid. That is, I was watching everything awfully close.
"Q. Had you driven this particular highway before? A. Yes, sir.
"Q. Were you familiar with that highway? A. Yes, sir.
"Q. Were you familiar with that highway? A. Yes, sir.
"Q. Had you driven it at night? A. Yes, sir.
"Q. Go ahead. A. I knew the highway was thick, especially on Saturday night.
"Q. Was it on Saturday night? A. Yes, sir, I met a car kind of coming off a grade up there.
"Q. About how far was it that you observed this car? A. I would say about three hundred feet. I cannot be positive.
"Q. Go ahead. A. I gave the signal for dimmers. He dimmed his lights and I dimmed mine.
"Q. You gave a signal for dimmers and he dimmed his lights and you dimmed yours? A. Yes, sir.
"Q. Are you positive of that? A. I am sure.
"Q. The car that dimmed its lights upon your signal for dimmers, whose car was that? A. Reese Stewart's.
"Q. The fellow with whom you had the accident? A. Yes, sir.
"Q. Did you know his name at that time? A. No, sir.
"Q. You only know him since by hearsay? A. That's right.
"Q. The car that you signalled for dimmers and which responded to your signal was the car that you later had the collision with? A. Yes, sir.
"Q. You may proceed to state what happened? A. Well, he drove smooth; I did too.
"Q. At the time you signalled for dimmers, about what was your speed? A. About thirty-five.
"Q. On what side of the highway were you traveling at that time? A. On the north; on my right hand side.
"Q. On your right hand side? A. Yes, sir.
"Q. Are you sure of that? A. I am positive.
"Q. On what side of the highway were you traveling up to the time that you first saw him? A. On the right hand side.
"Q. What compass side is that? A. North.
"Q. All right, at the time you saw him and signaled for dimmers, on what side of the highway was Mr. Stewart, apparently? A. He was traveling on his side.
"Q. Proceed from there on. A. He came on and didn't seem to be anything wrong. He got within, I would say, a hundred feet — I can't be positive on that, but somewhere around a hundred feet and he gave a big swerve and cut across to the north side of the road which would be my right. He stirred up dust over there.
"Q. Where did he stir up dust? A. On the north side of the road.
"Q. On the pavement? A. Off the pavement. He hit the cylinder (shoulder) on my side.
"Q. When you say that he was approximately a hundred feet from you he swerved to his left, did that put him directly in front of you? A. That's right.
"Q. Then what did you do? A. We were so close then I figured the only thing for me to do was to grab his side of the road.
"Q. Did you make any move in that direction until he came across in front of you? A. None whatever. *Page 35 
"Q. All right, proceed to say what happened? A. Well, it looked like he was going to leave the road and turn completely off to my right. I gave the truck a swerve to the left.
"Q. What compass direction was that the truck was going in? A. South.
"Q. Did you turn completely south off the highway, or turn south continuing on the highway? A. I veered south so that I would miss him if he was leaving the road.
"Q. Turning to your left? A. Yes, sir.
"Q. Go ahead. A. Instead of leaving the road, after he stirred up that dust he cut back straight in and hit me right at the dual wheels and gas tank.
"Q. The right front part of your truck? A. Yes, sir.
"Q. At the time he hit you, in what direction were you going? A. I had veered off from the southeast.
"Q. Is that in the direction going west? A. Southwest.
"Q. At that time where was the car with reference to the middle black line? A. All of his car was on the north side of the black line except the left front wheel might have been on the black line. I can't remember exactly. If it was over the black line it couldn't have been very far.
"Q. Where was your truck with reference to the middle black line? A. All completely on the south side of the road; maybe two feet sticking up on the pavement.
"Q. No, no. I mean when you were struck by Mr. Stewart's car, where was your truck and trailer with reference to the middle black line? Had any part of it gotten south of the black line? A. Only the front part.
"Q. Where was the rest of it? A. On the north side of the black line.
"Q. After you were hit, what happened? A. My truck flopped over on its left side and slid to a stop on the south side of the highway.
"Q. When you say 'flopped over,' will you describe that a little more fully? A. It laid over on its left side.
"Q. That is your truck cabin that you were in? A. Yes, sir.
"Q. What happened to the trailer? A. The trailer stayed connected to the tractor, but the dual wheels came completely out from under it.
"Q. Is that where your truck had been struck? A. Yes, sir.
"Q. By the car coming into it? A. That's right.
"Q. Where did the trailer end up? A. The trailer slid off into the ditch on the south side.
"Q. Did you see or contact any other vehicle at that time? A. Yes, sir, when my cab came to a stop on top of a 1941 Ford.
"Q. Whose car was that? Was it at the scene at that time? A. Yes, sir. I didn't know the man then, but I found out later that it was Mr. Frank Robbins.
"Q. Your car hit that car? A. Yes, sir.
"Q. Was Mr. Robbins in his car at the time? A. Yes, sir.
"Q. Was anyone else in the car with him? A. His wife."
It will be noted that neither Frank Robbins nor Mrs. Frank Robbins who, according to the record, were also eyewitnesses and actually involved in the accident, testified. Both the defendants and plaintiffs were aware of Robbins' residence in the State of Texas or knew how they could get in touch with him, for Robbins had filed a suit in Calcasieu Parish and was locally represented.
The record discloses that Ross Martin, driver of the defendants' truck, immediately after the accident went to the Stewart car and then came back to his truck, which took approximately four or five minutes, and then talked to Frank Robbins and Mrs. Frank Robbins. Counsel for the plaintiff strenuously objected to the witness testifying as to what Robbins and his wife said at that time. Counsel for defendants contended that it was admissible as part of the "res gestae" and made the following tender: *Page 36 
"By Mr. Plauche:
"Counsel for defendant tenders this witness and the questions and answers which have been previously excluded for the purpose of showing, one, that the witnesses, Frank Robbins and wife, immediately upon the witness' Martin's return to the truck, cursed and complained of Mr. Stewart's driving, stating that they saw exactly what happened; that they were immediately behind the Stewart car; that they had followed the Stewart car for several miles and had been afraid to pass it because he continued to cut out to the left. I want to tender this witness to show that at that time both Mr. and Mrs. Robbins made those assertions to this witness, Ross Martin, and that there had been no opportunity to reflect and contend that it is admissible as part of the res gestae. * * *
"By The Court:
"Let the record show that the objection be sustained if sustained on the ground that the testimony does not form a part of the res gestae."
We are of the opinion that the statements made by Frank Robbins and his wife would form a part of the res gestae and should have been admitted for the reason that Robbins and his wife were actually involved in the accident, their car was buried underneath the cab of the defendant's truck, and the statements followed within five minutes their extrication from the wreck. It must also be considered that Robbins is a plaintiff himself in a suit arising out of this same accident. These statements are almost a part of the occurrence itself, as Robbins and his wife were bound to have been excited and to have spontaneously made the statements. Day v. Armour Fertilizer Works, 8 La. App. 720; Butler v. Washington-Youree Hotel Co., La. App., 160 So. 825; Auzene v. Gulf Public Service Co., La. App., 188 So. 512; Temple v. Martin Veneer Co., La. App., 200 So. 676; Mancuso v. Hurwitz-Mintz Furniture Company, La. App., 183 So. 461; 10th R.C.L. page 976.
Counsel for defendants strenuously and, we believe, properly offered to prove the reason that he had not obtained the testimony of Robbins and his wife. Counsel for plaintiffs just as strenuously objected throughout the record to defendants' offering, yet made no offering nor gave any reason as to why plaintiff had not secured or attempted to secure the testimony of Robbins and his wife. The record contains sufficient to exonerate the defendants for not attempting to take the testimony of Frank Robbins or his wife. Therefore, such failure on the part of defendant cannot be construed against them. However, we believe that the failure of the plaintiff to attempt to secure the testimony of Robbins and his wife, or to offer a valid reason for not so doing should be taken into consideration, and the Court would be justified in presuming that the testimony of Robbins and his wife would have been unfavorable to plaintiff. Regardless of the ruling of the trial court as to the admissibility of the statements made by Frank Robbins and his wife at the scene and practically concurrent with the accident itself or within five minutes after the accident, there is sufficient testimony in the record upon which to base a judgment.
There is a hopeless conflict in the testimony of the eyewitnesses as to the manner in which the accident occurred, and it is, therefore, necessary to examine closely the physical facts and testimony of other witnesses in the case which might corroborate the plaintiffs' or defendant's version as to who was at fault in this accident.
The Judge of the District Court correctly stated the physical facts in his written opinion as follows:
"The highway at the scene of the accident is paved to a width of eighteen feet, and the shoulders are from twelve to fourteen feet in width on each side of the concrete slab. The highway is straight at that point and is level except for a slight dip or depression at or near the place where the accident occurred. The weather was clear and visibility was good.
"The point of impact was approximately on the black line which runs along the center of the concrete slab. The right front fender and wheel of the Stewart car struck the right side of the Herrin truck at about the point where the gas tank and dual wheels of the truck are located. At the *Page 37 
time of the collision, therefore, it is apparent that each vehicle was on its left or wrong side of the highway. After the impact plaintiffs' car remained in an upright position on the concrete portion of the highway, facing in a southeasterly direction, and the Herrin truck came to rest on the south shoulder of the highway at a point several feet west of the point of impact facing in a northwesterly direction with the trailer turned over on its left side, the rear end of the trailer being in the south ditch and the front end of the truck resting on the south edge of the concrete portion of the highway. The front or cab portion of the truck at first came to rest partly on its left side and resting on another automobile." (This being the automobile of Mr. and Mrs. Frank Robbins.) "Shortly after it came to rest in that position the other vehicle was moved and the cab then turned over on its left side."
We also have in the record the testimony of two State Troopers, W. A. Carpenter and Henry C. East, which must be considered. The District Court based its judgment greatly upon its interpretation of the physical facts and apparently gave greater weight to its interpretation of the physical facts than to the corroborating testimony of the two State Troopers. The record reveals that W. A. Carpenter was a trooper with the Department of State Police at Lake Charles, Louisiana, on the date of the accident; that he was in the car with Trooper Henry C. East when they received a radio call informing them of a serious accident on U.S. Highway 90; that they proceeded to the scene and found the Herrin truck and trailer and the car which belonged to Reese Stewart had been involved in this accident. He further testified as follows:
"Q. After you directed traffic for awhile, what did you and Trooper East do? A. We went to St. Patrick's Hospital after we got the scene cleared up to where we could get the traffic through. We then proceeded to St. Patrick's Hospital.
"Q. Were you present — was Mr. Reese Stewart there at the hospital? A. Yes, sir.
"Q. Was he interviewed by anyone? A. Yes, sir.
"Q. By whom? A. Trooper East.
"Q. Were you there when that interview took place? A. Yes, sir.
"Q. Do you distinctly recall some of that conversation and some of the statements made by Mr. Reese Stewart to Trooper East? A. Yes, sir.
"Q. Did Mr. Stewart assign any cause as to how the accident had happened in that interview in your presence? A. Yes, sir.
"Q. What did he say caused it? A. Mr. Stewart said that he was traveling east on Highway 90 and he said this truck was approaching.
"Q. Did he say that it was in his wrong traffic lane?
"By Mr. Reed: Your Honor, that is leading the witness and making suggestions as to what he should testify. He will not even let the witness answer the question.
"By Mr. Plauche: The last question was leading, I know. The rest was asking what he said.
"By The Court: Proceed with the examination.
"By Mr. Plauche:
"Q. What did he assign as the cause of the accident in his words? A. He said there was some bright lights from the rear of the car; the car in the rear of the truck had bright lights that caused him to be blinded and he lost control of his car.
"Q. Stewart said that? A. Yes, sir.
"Q. Do you remember that Mr. Carpenter? A. Yes, sir.
"Q. What did he say with reference to the lights of the Herrin truck, if he said anything? A. He said they were dimmed.
"Q. Did he say anything about his own lights? A. Yes, sir, he said his lights were dimmed.
 "Cross Examination
"By Mr. Reed:
"Q. You were present also when the truck driver, Ross Martin, was interviewed? A. Yes, sir. *Page 38 
"Q. Are you sure he wasn't the one who made this statement about a car coming behind Stewart's car with bright lights that blinded him? A. No, sir.
"Q. Are you positive of that? A. Yes, sir, I am positive of it.
"Q. Isn't it possible that Mr. Stewart's statement was that he was blinded by the truck lights? A. No, sir.
"Q. How long after the accident was it that you talked to Mr. Stewart, you and Mr. East; I imagine he did the interviewing? A. Well it was right at about two hours before we got to the hospital — before we got the traffic cleared up and could leave the scene of the accident. We were scared to leave the truck because it was loaded with hand grenades and we were afraid of a fire catching and causing some road hazard.
"Q. You wouldn't say positively that that was Mr. Stewart's statement, that the bright lights of the car behind the truck blinded him? A. Yes, sir, that was the statement that he gave us at the hospital. We have it on our report.
 "Redirect Examination
"By Mr. Plauche:
"Q. You stated in answer to counsel that you were present when the driver of the truck was interviewed? A. Yes, sir.
"Q. What cause did he assign for the accident? A. He said the Stewart car came over on his traffic lane and he said when he seen the car come across — well, he swerved to the south side of the highway to avoid a head on collision."
"Trooper Henry C. East testified in part as follows:
"Q. Did you interview the people there? A. Yes, sir.
"Q. Did you interview or see the truck driver of the Herrin truck? A. I talked with him and got a statement from him.
"Q. What was his condition mentally and physically at that time? A. Normal as far as I could see.
"Q. Did he appear to be intoxicated? A. Not that I could see.
"Q. After you had conducted your investigation and interview, and Trooper Carpenter had cleared the traffic did you then leave the scene? A. Yes, sir, we went to the hospital.
"Q. Was Mr. Stewart at the scene of the accident? A. No, sir.
"Q. Was he at the hospital when you arrived there? A. Yes, sir.
"Q. Did you interview him? A. Yes, sir.
"Q. You did? A. Yes, sir.
"Q. Was Trooper Carpenter present when that interview occurred? A. He was.
"Q. Do you recall some of the things that Mr. Stewart said at that time? A. Well, we talked to him with reference to the accident and asked what caused it.
"Q. What did he say caused it in his own words? A. He said there were bright lights to the rear of the truck that blinded him; that caused him to lose control of his vehicle.
"Q. He said that? A. Yes, sir.
"Q. Did he use the words, "lost control" of his vehicle? A. Yes, sir.
"Q. Did he say anything with reference to the lights of the Herrin Truck? A. Yes, he said they were dimmed and his lights were also dimmed.
"Q. He specifically said the Herrin truck lights had been dimmed? A. The lights of both vehicles were dimmed.
"Q. Did he state whether or not the Herrin truck was on the wrong side of the road? A. No, sir."
The testimony of these two troopers corroborates the testimony of Ross Martin, driver of the truck. There was a written report made by the troopers of this accident and the result of their investigation, which included the statements made by the plaintiff, Reese Stewart, and Ross Martin. Certainly, Reese Stewart would have told the troopers that the Herrin truck was on the wrong side of the road if it had been. Stewart's statement that he lost control of his vehicle corroborates the statement of Martin that Stewart suddenly swerved to his left when at a distance of about 100 feet. Also, in his statement to the troopers shortly after the accident at St. Patrick's *Page 39 
Hospital in Lake Charles, Reese Stewart told them that the lights on the defendant's truck were dimmed as well as his own. Ross Martin also stated to the troopers immediately after the accident that this was true and, on the trial of the case, testified that his lights were dimmed as well as Stewart's. However, on the trial of the case, Stewart testified that the lights on the defendant's truck were bright and not dimmed. While there is no testimony that there was a car behind the Herrin truck, regardless of the cause, the most material part of Stewart's statement is that he "lost control" of his car. We find nothing in the record and can think of no reason why these two troopers, charged with the duty of investigating accidents such as the one in the case at bar, would have wanted to make a report and testify to facts which were not in line with what their investigation revealed. They had no interest, as far as we can see, in quoting a statement made by Mr. Stewart which was not true. As was stated by this Court through Judge Ott in Falgout v. Younger, La. App., 192 So. 706, 709, "The statements made by the witnesses shortly after the accident to these policemen are relative and significant."
The Judge of the District Court seemed to base his judgment almost entirely upon his deductions from the physical facts plus the testimony of Mrs. Reese Stewart. Mrs. Stewart repeatedly referred to the "bright lights" of the motor vehicle apparently approaching them just immediately prior to the accident. This would seem to corroborate the testimony of the State Troopers as given them by Reese Stewart, for it will be noted that Reese Stewart told the Troopers that the cause of the accident was that, "There were bright lights in the rear of the truck that blinded him; that caused him to loose control of his vehicle." Her testimony is not sufficient to overcome our conviction that the plaintiffs failed to produce sufficient evidence to entitle them to a judgment in this case. The physical facts which he relied on, however, have not so much to do with the relative position of each vehicle after it had come to a stop following the impact but with a far more intricate proposition in the law of physics, that is, as to exactly what caused them to come to rest in the positions they did following the wreck. No positive deductions could be made upon which a judgment could be based from the position of the two vehicles after the wreck. The position of either vehicle following the wreck does not offer any positive proof as to what caused the truck, on the one hand, to turn over as it did, or the plaintiffs' car to come to a stop facing in a southeasterly direction. One could only speculate.
However, we do not think this is a case which depends entirely upon the physical facts, for we are of the opinion that plaintiffs have failed to produce sufficient testimony to support a judgment in their favor. Granting them to be both honest and sincere in their statements, there is no reason why the same amount of credence should not be given to the testimony of the truck driver. As between them, the testimony relating to the position of the two vehicles on the highway when they were about 100 feet apart may be said to be equally divided. Beyond that, however, the plaintiffs have produced nothing unless it be the physical facts so strongly relied upon by the Trial Judge and which offer no positive proof upon which plaintiff could recover. Defendants, on the other hand, have offered the testimony of the two State Troopers which we are unable to ignore.
We are of the opinion that plaintiffs have failed to prove that the driver of defendants' truck was guilty of any negligence which was the, or a, proximate cause of this accident, and are, therefore, of the opinion that the judgment of the District Court should be reversed and it is accordingly ordered that plaintiffs' suit be dismissed at their cost.